75 N.J. Super. 560 (1962)
183 A.2d 678
ELMER T. HOAGLAND, PLAINTIFF-RESPONDENT,
v.
WILLIAM C. SPRINGER, DEFENDANT-RESPONDENT, AND CUMMINS ENGINE COMPANY, INC., A CORPORATION OF THE STATE OF INDIANA, CUMMINS DIESEL METROPOLITAN, INC., A CORPORATION OF THE STATE OF DELAWARE, DEFENDANTS, AND CUMMINS DIESEL MICHIGAN, INC., A CORPORATION OF THE STATE OF MICHIGAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1962.
Decided July 5, 1962.
*561 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Herman D. Michaels argued the cause for appellant (Messrs. Toner, Crowley, Woelper and Vanderbilt, attorneys).
Mr. Francis M. Seaman argued the cause for respondent Hoagland (Messrs. Seaman & Clark, attorneys; Mr. Sam Weiss, on the brief).
Mr. Leroy H. Mattson argued the cause for respondent Springer (Messrs. Troast, Mattson & Madden, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant Cummins Diesel Michigan, Inc. (hereinafter Michigan) sought leave, pursuant *562 to R.R. 2:2-3, to appeal from two Law Division orders respectively denying its motions to dismiss plaintiff's action and defendant Springer's cross-claim, or in lieu thereof to quash and vacate the return of the summons served upon it. The grounds for the motions were that the court lacked jurisdiction over Michigan and, further, Michigan was not subject to service of process within the State of New Jersey under R.R. 4:4-4(d) in that Erwin H. Jahn, of Cummins Diesel Metropolitan, Inc. (hereinafter Metropolitan), the person upon whom service against Michigan was made at Metropolitan's Newark, N.J., office, was not an officer, director, trustee, managing agent or servant of Michigan, and Metropolitan was not a registered agent of Michigan or authorized to accept service for it. We granted leave to appeal. The parties having fully briefed the jurisdictional question, it was agreed that this court proceed to dispose of the appeal without further briefs or argument.
Plaintiff instituted this action against defendant Springer, Cummins Engine Company, Inc., an Indiana corporation (hereinafter Engine), Cummins Diesel Michigan, Inc., a Michigan corporation, and Cummins Diesel Metropolitan, Inc., a Delaware corporation authorized to do business in New Jersey, to recover for serious personal injuries sustained when the Diesel engine in Springer's Ford tractor exploded while plaintiff was operating the tractor on the New Jersey Turnpike on July 13, 1960. Springer had entered into negotiations with a representative of Michigan, in Dearborn, Michigan, in February 1960 for converting his Ford tractor conventional engine to a Cummins Diesel engine. The contract for the conversion was executed on March 25 following, and the work completed sometime during the first week of April 1960.
Springer took delivery of the converted tractor in Dearborn, and then drove to Wayne, Michigan, to receive a load of automobiles for transportation to New Jersey. While riding along the Pennsylvania Turnpike he noticed that the oil pressure kept dropping. He finally stopped and phoned *563 Cummins Diesel Michigan and explained his difficulties to its representative, one Yaek. Yaek instructed Springer to check the oil dilution. He checked the oil line and then put through a second call to Yaek, who told him not to be too concerned, but to continue on, making certain that the oil pressure did not drop below 20 pounds. He instructed Springer to take the tractor to Metropolitan "first thing" on arrival at Newark, N.J. Springer did so, and Metropolitan apparently corrected the difficulty that was causing the dilution, at the same time replacing the oil, changing the filters, replacing a washer in one fuel line and making a 3,000-mile check, although the new engine had been run only 700 miles. Springer was personally billed for $24.09, representing the oil change and filters. He was not billed for the correction of the dilution difficulty or the 3,000-mile checkup, for which Metropolitan was paid under the Cummins Engine Company warranty. On his return to Dearborn, Springer discussed the $24.09 bill with Yaek and was reimbursed by Michigan.
The first four counts of the complaint respectively charge Springer, Engine, Michigan and Metropolitan with negligence directly and proximately resulting in plaintiff's injuries. Plaintiff specifically charged that each of the three Cummins companies knew or had reason to know the purpose for which the Diesel engine and its component parts were intended, and that a defect in their construction and the installation of an engine and parts of improper design would constitute an inherently and imminently dangerous instrumentality. He also charged Engine and Michigan with failure to exercise reasonable care, skill and diligence in the manufacture, assembly, inspection, testing, design and installation of the engine and its component parts, thereby rendering them unsafe and unfit for installation, use and operation. The charge against Metropolitan was failure to exercise reasonable care, skill and diligence in inspecting and testing the design, assembly, construction and installation of the Diesel engine and its component parts, and to discover and give notice or warning to defendant *564 Springer of their defects and improper design, assembly, construction and installation. The fifth count charged joint and several negligence of the defendants Engine, Michigan and Metropolitan, directly and proximately resulting in the explosion and plaintiff's injuries. The sixth and seventh counts, respectively directed to Engine and Michigan, were based upon breach of an express or implied warranty of merchantability. The eighth count charged them jointly and severally with breach of that warranty.
Springer answered and cross-claimed against the three Cummins companies, the allegations of the cross-claim essentially paralleling those of the complaint and, in addition, demanding property damages. Michigan then moved to dismiss the complaint and cross-claim or, in the alternative, to quash and vacate the return of service, for the reasons already stated. In denying these motions the Law Division judge delivered an oral opinion, reported in 74 N.J. Super. 275 (1962). He outlined in some detail the relations of Engine  a major manufacturer of Diesel engines, with its principal plant located in Indiana  to its network of some 50 distributors (among them Michigan and Metropolitan) and many dealers located throughout the United States. We find entirely correct his characterization of each distributor and dealer as "an integral spoke in a wheel in which Engine is the hub. Without each spoke Engine could hardly carry on its vast empire of operations." He pointed out that Engine maintains a teletype network which gives it direct contact with all distributors, and also serves as a direct communication between distributors across the nation. By means of this teletype system, distributors are able to order Engine products directly from the manufacturer and obtain parts from each other whenever occasion arises. He observed that
"Michigan, like Metropolitan, is an integral and component part of Engine's empire, together with the other forty-eight distributors spread throughout these United States. They comprise a team whose *565 existence is dependent upon Engine, and whose aim is to sell and service Engine's products. In the process, of course, they not only further the interests of Engine, but presumably make money for themselves."
Springer was not the only customer whom Michigan had directed to Metropolitan for necessary repairs. James Ireland, whose deposition was before the trial court, testified that Michigan had installed a Diesel engine in his Ford tractor in 1959. When he discovered that water was getting into the oil system he phoned Cummins Diesel Michigan from Newark, N.J. and spoke to Yaek. Yaek directed him to go to Metropolitan because "[Y]ou'll never make it back here [to Dearborn]."
Erwin J. Jahn, office and credit manager of Metropolitan, testified on deposition to business done by his company with Engine, giving the figures for products purchased and work done under Engine's warranties during the years 1959 through 1961. These are summarized in the Law Division opinion. He also testified that Metropolitan had had business with Michigan directly. In 1959 it had done work for that company on two pieces of equipment sold by Michigan, totalling $166.15, billed directly to and paid by Michigan. These two jobs, represented by invoices in evidence, had been duly authorized by Michigan. Jahn said that the procedure usually followed in servicing Diesel engines was to call the distributor or dealer; in some cases the other dealer might call and say that a truck was on the way in, and authorize the work to be done on it.
In 1960 Michigan ordered parts from Metropolitan at a total cost of $174.04. In 1962 (through February) Michigan ordered and paid for parts totalling $340.51. In turn, Metropolitan purchased parts from Michigan: a total of $26.32 in 1959, $1,623.67 in 1960; $1,508.42 in 1961, and $266.34 in 1962 (through February). Jahn testified that Metropolitan was still doing business with Michigan.
We agree with the Law Division judge that Michigan had sufficient minimum contacts with New Jersey to support *566 the service that was here made by registered mail, return receipt requested, addressed to its principal place of business in Dearborn. R.R. 4:4-4(d) provides that service may be made
"Upon a domestic or foreign corporation, by serving, in the manner prescribed in paragraph (a), an officer, director, trustee or a managing or general agent; or if service cannot be made upon any of the foregoing and if there is no office or place of business within this State, by serving any servant of the corporation within this State acting in the discharge of his duties; or by delivering a copy of the summons and complaint to any person authorized by appointment or by law to receive service of process on behalf of the corporation; or by leaving a copy of the same at the registered office of the corporation with any person in charge thereof; or, if service cannot be made upon any of the foregoing and the corporation is a foreign corporation, then, subject to due process of law, by mailing, registered mail return receipt requested, a copy of the summons and complaint to a registered agent for service, or to its principal place of business, or to its registered office." (Emphasis added).
To subject a foreign corporation to a judgment in personam, where that corporation is not present within the territory of the forum, due process requires only that it have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Company v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945). As Chief Justice Stone said in that case, the demands of due process "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there. An `estimate of the inconveniences' which would result to the corporation from a trial away from its `home' or principal place of business is relevant in this connection." (326 U.S., at page 317, 66 S.Ct., at page 158) The test is not whether the foreign corporation's activity in the state of the forum "is a little more or a little less," but rather "the quality and nature of the *567 activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure."
In McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957i, the court found it sufficient for the purposes of due process that the California suit against a Texas insurance company, which had been served in Texas, was based upon a single contract of reinsurance that had "a substantial connection" with California. Justice Black, speaking for the court, noted that in a continuing process of evolution the Supreme Court had accepted and then abandoned "consent," "doing business," and "presence" as a standard for measuring the extent of state judicial power over foreign corporations. After referring to the International Shoe case, he observed:
"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalism of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (355 U.S., at pages 222-223, 78 S.Ct., at pages 200, 201)
Cf. Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).
The power of a state to exert jurisdiction over nonresidents has greatly expanded since the decision in Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877), particularly in recent years with respect to foreign corporations. The International Shoe and McGee cases, above, point the way. They recognized the changes brought about by the tremendous technological and economic progress achieved in our day. As was recently said in Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 433, 176 N.E.2d *568 761, 766 (Sup. Ct. 1961), unless these changes are recognized,
"* * * jurisdictional concepts which may have been reasonable enough in a simple economy lose their relation to reality, and injustice rather than justice is promoted. Our unchanging principles of justice, whether procedural or substantive in nature, should be scrupulously observed by the courts. But the rules of law which grow and develop within those principles must do so in the light of the facts of economic life as it is lived today. Otherwise the need for adaptation may become so great that basic rights are sacrificed in the name of reform, and the principles themselves become impaired."
Recent judicial decisions, as the court observed in Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (Sup. Ct. 1951), reveal a dual trend. The trend in defining due process is away from the court having immediate power over a defendant and toward the court in which both parties may conveniently settle their dispute. And in defining due process of law, the trend is away from emphasis on territorial limitations and toward emphasis on providing adequate notice and opportunity to be heard. The implications of the International Shoe and McGee cases are part of these trends, and the broad standards there laid down will undoubtedly be attended by further extension.
Our own jurisdiction has drawn inspiration from the new approach to jurisdiction indicated in the cited United States Supreme Court cases. See Miklos v. Liberty Coach Co., 48 N.J. Super. 591 (App. Div. 1958), which resulted in the amendment of R.R. 4:4-4(d) by adding the italicized clause quoted above; Malavasi v. Villavecchia, 62 N.J. Super. 510 (Law Div. 1960), reviewing the authorities; cf. Dowd v. Boro. Drugs, Inc., 70 N.J. Super. 488 (App. Div. 1961) (substantial minimum contacts not found). And see Restatement, Conflict of Laws 2d, Tentative Drafts Nos. 3-4, §§ 84 and 85, and 91(a) ("A state has judicial jurisdiction over a foreign corporation as to cause of action *569 arising out of (1) an act done, or caused to be done, by the corporation in the state or resulting in consequences there * * *"), 92.
We cannot disregard the economic realities of the situation exposed by the record in this case. Indiana and its distributors form one, cohesive, economic unit. In the pursuit of business profits and their general economic well-being they are all concerned with the successful selling and servicing of Indiana's products, but for whose existence neither the mother company nor its distributors would have any reason for being. That Cummins was organized on the basis of a parent-manufacturer selling its products through independent distributors was a decision reached by its officers and directors, perhaps in an effort to avoid future difficulties with federal and state tax laws and other legislation.
On the basis of the record, it cannot reasonably be believed that the Cummins management intended, by having independent distributors, to divorce them completely or effectively from Indiana. The uncontroverted facts point the other way. All distributors had a form of rapid communication, one with the other and with the mother company, in order to effect quick delivery of needed parts from one distributor or another should Indiana not be able to fulfill that need. Furthermore, in an obvious effort to attract customers, keep them satisfied, and permit the Cummins family to meet competition, arrangements were made so that a product sold by one distributor would be serviced by another, either during the period of the running of warranty or at any time thereafter. This was in fact done by Metropolitan in Newark, N.J., for Michigan's customers  not only for Springer, but also for Ireland and at least two others. There is also the fact that sales had over the past few years been consummated between Michigan and Metropolitan, the one buying from the other. Indeed, it would not be unreasonable to say that Metropolitan was Michigan's special agent, both actual and potential, for the servicing *570 of products bought from Michigan. But that aside, we are persuaded that in the factual context of this case Michigan had substantial and significant minimum contacts with the State of New Jersey.
We agree with the trial judge that Michigan had a sufficient continuous contact with this State to satisfy our concept of due process, and that to permit plaintiff to maintain his complaint, and Springer to maintain his cross-claim, against Michigan will not offend our traditional notions of fair play and substantial justice. To conclude otherwise would, in the words of the trial judge, permit Michigan to receive the fruits of its New Jersey activities without the attendant liabilities which should go with it.
Since we have concluded that the registered mail, return receipt requested, service upon Michigan under R.R. 4:4-4(d) is consistent with due process, there is no need to consider whether the service upon Erwin H. Jahn, at Metropolitan's Newark office, was sufficient to give the court jurisdiction. This disposes of Michigan's contention that the Law Division lacked jurisdiction by reason of the insufficiency of service on Jahn. Michigan does not claim that the registered mail service was otherwise insufficient. The notice was received, Michigan knew of the pending action, and indeed, in response to the notice, came into our court and made the motion it did. Cf. International Shoe Company v. State of Washington, above.
Michigan does not raise the issue of forum non conveniens. As the trial judge noted, it is far less burdensome for Michigan to come into New Jersey to attend our courts than it would be for plaintiff to be compelled to sue it in its state of incorporation, Michigan. The engine which Michigan installed, and which Metropolitan repaired, was a powerful and, if defective, potentially dangerous instrumentality. Its explosion resulted in extensive injuries to Hoagland, including the loss of a lower extremity. Springer, as well as the witnesses who will testify as to the defective condition of the engine and its component parts, are here *571 in New Jersey. Medical, hospital and expert witnesses are also in this State. Plaintiff and defendant Springer would be required to expend large sums to produce those witnesses in Michigan.
All in all, it is more desirable and practical to bring all the parties together in one action and thus avoid a multiplicity of suits. It would not only be inconvenient, but expensive, were plaintiff compelled to try one phase of this case against defendants Springer and Metropolitan in New Jersey, another phase against Michigan in Michigan, and yet a third against Engine in Indiana. Cf. Malavasi v. Villavecchia, above, 62 N.J. Super., at pages 520-521.
Affirmed.